Michael R. Lozeau (State Bar No. 142893)
Rebecca L. Davis (State Bar No. 271662)
E-mail: michael@lozeaudrury.com
          rebecca@lozeaudrury.com
LOZEAU DRURY LLP
1939 Harrison St., Suite 150
Oakland, CA 94612
Tel: (510) 836-4200
Fax: (510) 836-4205

Attorneys for Plaintiff
THE CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a California nonprofit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>Tri C Manufacturing, Inc., a California corporation,<br><br>Defendant. | Case No.  2:20-cv-00037-TLN-EFB<br><br>CONSENT DECREE<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

**CONSENT DECREE**

The following Consent Decree is entered into by and between Plaintiff The California Sportfishing Protection Alliance ("Plaintiff" or "CSPA") and Defendant Tri C Manufacturing, Inc. ("Defendant" or "Tri-C").  The entities entering into this Consent Decree are each an individual "Settling Party" and collectively the "Settling Parties" or "Parties."

**WHEREAS**, CSPA is a 501(c)(3) non-profit, public benefit corporation duly organized and existing under the laws of the State of California, dedicated to the protection, enhancement, and restoration of the Sacramento River, its tributaries, and other California waters;

**WHEREAS**, Tri-C is the owner and operator of a facility located at 520 Harbor Boulevard in West Sacramento, California that recycles used tires and manufactures equipment to shred and sort tires, among other activities (the "Facility");

**WHEREAS**, the Facility falls within Standard Industrial Classification ("SIC") codes 5093 (Scrap and Waste Materials) and 3559 (special industrial machinery, NEC);

**WHEREAS**, storm water discharges associated with industrial activity at the Facility are regulated pursuant to the National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 [State Water Resources Control Board], Water Quality Order No. 92-12-DWQ (as amended by Water Quality Order 97-03-DWQ and as subsequently amended by Water Quality Order No. 2014-0057-DWQ) (hereinafter the "Permit"), issued pursuant to Section 402 of the Federal Water Pollution Control Act ("Clean Water Act" or "the Act"), 33 U.S.C. §§ 1251 *et seq.*;

**WHEREAS**, the Permit includes the following requirements for all permittees, including Tri-C: 1) develop and implement a storm water pollution prevention plan

CONSENT DECREE                                    2                    Case No. 2:20-cv-00037-TLN-EFB

("SWPPP"); 2) control pollutant discharges using best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT") to prevent or reduce pollutants; 3) implement BAT and BCT through the development and application of Best Management Practices ("BMPs"), which must be included and updated in the SWPPP; and 4) when necessary, implement additional BMPs to prevent or reduce any pollutants that are causing or contributing to any exceedance of water quality standards;

**WHEREAS**, on October 8, 2019 CSPA served Tri-C, the Administrator of the United States Environmental Protection Agency ("EPA"), the Executive Director of the State Water Resources Control Board ("State Board"), the Executive Officer of Regional Water Quality Control Board, Central Valley ("Regional Board"), the U.S. Attorney General, and the Regional Administrator of the EPA (Region 9) with a notice of intent to file suit under Sections 505(a)(1) and (f) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A) ("60-Day Notice Letter"), alleging violations of the Act and the Permit at the Facility;

**WHEREAS**, on January 6, 2020, CSPA filed a complaint against Tri-C in the United States District Court, Central District Court of California, entitled *California Sportfishing Protection Alliance v. Tri C Manufacturing, Inc.* (Case No. 2:20-cv-00037-TLN-EFB); alleging violations of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), and violations of the Permit at the Facility ("Complaint") based on the 60-Day Notice Letter;

**WHEREAS**, CSPA contends in its 60-Day Notice Letter and Complaint that, among other things, Tri-C has repeatedly discharged polluted storm water in violation of the Permit and the Clean Water Act;

**WHEREAS**, Tri-C denies all allegations set forth in the 60-Day Notice Letter

and Complaint relating to the Facility;

**WHEREAS**, the Settling Parties, through their authorized representatives and without either adjudication of CSPA's claims or any admission by Tri-C of any alleged violation or other wrongdoing, believe it is in their mutual interest to resolve in full CSPA's allegations in the 60-Day Notice Letter and Complaint through settlement and avoid the cost and uncertainties of further litigation;

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE SETTLING PARTIES, AND ORDERED AND DECREED BY THE COURT, AS FOLLOWS:**

1.      The Court has jurisdiction over the subject matter of this action pursuant to Section 505(a)(l)(A) of the Clean Water Act, 33 U.S.C. § 1365(a)(1)(A);

2.      Venue is appropriate in the Eastern District of California pursuant to Section 505(c)(l) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because the Facility at which the alleged violations took place is located within this District;

3.      The Complaint states claims upon which relief may be granted pursuant to Section 505(a)(l) of the Clean Water Act, 33 U.S.C. § 1365(a)(1);

4.      Plaintiff has standing to bring this action;

5.      The Court shall retain jurisdiction over this matter for purposes of enforcing the terms of this Consent Decree for the life of the Consent Decree, or as long thereafter as is necessary for the Court to resolve any motion to enforce this Consent Decree.

## I.      OBJECTIVES

6.      It is the express purpose of the Settling Parties entering into this Consent Decree to further the objectives set forth in the Clean Water Act, 33 U.S.C. §§ 1251, *et seq.,* and to resolve those issues alleged by CSPA in its Complaint.  In light of these

objectives and as set forth fully below, Defendant agrees to comply with the provisions of this Consent Decree and to comply with the requirements of the Permit and all applicable provisions of the Clean Water Act at the Facility.

## II.    COMMITMENTS OF TRI-C

7.    In order to reduce or prevent pollutants associated with industrial activity from discharging via storm water to the waters of the United States, Tri-C shall implement appropriate structural and non-structural BMPs, as required by the Permit, as described more fully below.

8.    **Maintenance of Implemented Storm Water Controls.**  Tri-C agrees that the Facility shall maintain in good working order all storm water collection and management systems currently installed or to be installed pursuant to this Consent Decree, including but not limited to, existing housekeeping measures.

9.    **Structural Improvements to Storm Water Management Measures.** Unless otherwise indicated in paragraph 25, Tri-C shall implement the below structural best management practices to improve storm water management at the Facility.  Given the business and other uncertainties related to the current COVID-19 crisis and the potential sale and assignment of the business, Tri-C shall use its best efforts to implement the following structural BMPs by October 1, 2020, but, shall in any event implement each of the following BMPs at the Facility by no later than January 1, 2021:

a.    **Storm Water Treatment System.**  Tri-C shall install and maintain Phase 1 of the treatment system ("Phase 1 Treatment System") described in the Frog Environmental/Storm Proof "Storm Water Treatment System Description and Sizing Tri-C Manufacturing" dated July 15, 2020 (the "Proposal"), attached hereto as Exhibit A.  Installation of the Phase 1 Treatment System shall include

Facility site upgrades to redirect storm water flow form discharge points DP#1, DP#2, and DP#3 to a single discharge location where the Phase 1 Treatment System will be located.  The Phase 1 Treatment System shall be designed to store, and  prevent bypass, during peak discharges for storms at least double the 85th percentile hourly intensity, and to treat an 85th percentile 24-hour storm volume for drainage areas 1, 2, and 3, as identified on the Facility's SWPPP map, attached hereto as Exhibit B.  The Phase 1 Treatment System will be designed to handle and treat without bypass, at a minimum, the maximum flow rate of runoff produced by the 85th percentile hourly rainfall intensity, as determined from local historical rainfall records, and store double the discharge from an 85th percentile storm, in accordance with the General Permit. When combined with the Phase 1 Treatment System's drop inlets, pumps, clarifiers, and other elements of the Phase 1 Treatment System, the capacity based on this rate is 50 gallons per minute ("gpm") for Drainage Areas DP#1, DP#2 and DP#3  The Treatment System shall be designed to achieve reduction of pollutant levels below NALs.

        b.      Prior to installation, the design of the Treatment System must be approved by a qualified Professional Engineer.

        c.      Tri-C shall notify CSPA of any bypass of the treatment system that occurs from runoff during or following a rain event.

        d.      Within ten (10) days of the installation of the Phase 1 Treatment System, Tri-C shall provide CSPA with a written report certifying that it has completed installation and containing digital photographs of the installed measures.

    10.    **Exposure Minimization BMPs.**  By September 1, 2020, Tri-C shall implement the following exposure minimization BMPs at the Facility:

        a.      To prevent rainfall from coming into contact with ground rubber

and metal debris stored in the bunkers on the western edge of the 520 Harbor Parcel, as depicted in Exhibit B, Tri-C shall install the necessary infrastructure to facilitate a temporary covering over the bunkers that will be mobilized for all ongoing storm events.

      b.     To prevent rainfall from coming into contact with dust and particulate generated from the Facility's outdoor classifier unit , Tri-C shall install covers over the classifier section of the processing line located on the south side of the Indoor Production building, as depicted in Exhibit B.

11.    **Improvements to Housekeeping Measures at the Facility.  B**y September 1, 2020, Tri-C shall implement the following housekeeping procedures at the Facility:

    a. Tri-C shall conduct daily sweeping of all paved areas of the Facility using a regenerative sweeper.  Tri-C shall also conduct sweeping at the bunkers, depicted in Exhibit B, any time rubber crumb is loaded or unloaded from the bunkers.  All sweeping activities shall be recorded in a sweeping log.

    b. Tri-C shall repair all cracked pavement areas of the Facility that inhibit storm water flowing to discharge points DP#1, DP#2, or DP#3.

12.    **Additional Monitoring and Sampling.**  Tri-C shall conduct the following enhanced monitoring and sampling procedures.

    a. **Storm Water Analysis**.  Tri-C shall analyze each storm water sample taken in accordance with the General Permit and this Consent Decree for, at a minimum, pH, total suspended solids, oil and grease, iron, aluminum, and Zinc.

    b. During the 2020-2021 reporting year, Tri-C shall sample and analyze

storm water discharges from, at a minimum, the first four Qualifying Storm Events ("QSEs," as defined in the General Permit), in the manner set forth in the General Permit.  If the Facility's storm water sampling results from the first two QSEs during the 2020-2021 reporting year indicate that the average of the analytical results for aluminum, iron, zinc, TSS, or pH exceed the annual NALs (as set forth in the General Permit and listed below in Table 1) (a "Non-Complying Result"), Tri-C shall upgrade the Phase 1 Treatment System by installing and maintaining the carbon media upgrade described in Exhibit A as Phase 2 (the "Phase 2 Treatment System") by no later than 60-days after receipt of the Non-Complying Result. If the first two QSEs during the 2020-2021 reporting year do not demonstrate an exceedance, but the sampling results from all four QSEs during the 2020-2021 reporting year indicate that the average of the analytical results for aluminum, iron, zinc, TSS, or pH exceed the annual NALs, then Tri- shall upgrade the Phase 1 Treatment System by installing and maintaining a Phase 2 Treatment System by September 1, 2021.

c. If Tri-C is required to install the Phase 2 Treatment System pursuant to paragraph 12(b), Tri-C shall sample and analyze, at a minimum, the first four QSEs during the 2021-2022 reporting year, in the manner set forth in the General Permit.   If the Facility's storm water sampling results from the first two QSEs during the 2021-2022 reporting year indicate that the average of the analytical results for aluminum, iron, zinc, TSS, or pH exceed the annual NALs (as set forth in the General

8

Permit and listed below in Table 1), Tri-C shall upgrade the Phase 2 Treatment System by installing and maintaining the metals media upgrade described in Exhibit A as Phase 3 (the "Phase 3 Treatment System") by no later than 60-days after receipt of the Non-Complying Result.   If the first two QSEs during the 2021-2022 reporting year do not demonstrate an exceedance, but the sampling results from all four QSEs during the 2021-2022 reporting year indicate that the average of the analytical results for aluminum, iron, zinc, TSS, or pH exceed the annual NALs, then Tri- shall upgrade the Phase 2 Treatment System by installing and maintaining a Phase 3 Treatment System by September 1, 2022.

d. For purposes of this Consent Decree only, if a QSE occurs at the Facility and Tri-C fails to take a sample of that QSE or fails to have a sample from that QSE analyzed, the Parties stipulate that Tri-C shall make a payment of $2,500.00 to the Rose Foundation for Communities and the Environment pursuant to the terms described in paragraph 15, below.

e. **Monitoring Results.**  Results from the Facility's sampling and analysis during the term of this Consent Decree shall be provided to CSPA within thirty (30) days of receipt of the sampling results by Tri-C or its counsel.

**Table 1. Numeric Limitations.**

| Contaminant | Numeric Limit |
|---|---|
| Aluminum | 0.75 mg/L |

| Iron | 1.0 mg/L |
|---|---|
| Zinc | 0.26 mg/L |
| Total Suspended Solids | 100 mg/L |
| pH | 6.0 – 9.0 s.u. |

13.    **Amendment of SWPPP.**  Within thirty (30) days of the Effective Date, Tri-C shall amend the Facility's SWPPP to the extent necessary to incorporate all changes, improvements, and best management practices set forth in or resulting from this Consent Decree.  Tri shall ensure that all maps, tables, and text comply with the requirements of the Permit.  Specifically, the map shall depict each of the Facility's drainage areas.   A copy of the amended SWPPP shall be provided to CSPA within ten (10) business days of completion.

14.    **Provision of Documents and Reports.**  During the term of this Consent Decree, Tri-C shall provide CSPA with a copy of all documents submitted to the Regional Board or the State Board concerning the Facility's storm water discharges, including but not limited to all documents and reports submitted to the Regional Board and/or State Board as required by the Permit.  Such documents and reports shall be mailed to CSPA contemporaneously with submission to such agency.  Alternatively, to the extent that Tri-C submits such documents to the Regional Board or State Board via the State Board's Stormwater Multiple Application and Report Tracking System ("SMARTS"), Tri-C may satisfy this requirement by providing notice to CSPA via e-mail that said results have been uploaded to SMARTS within seven (7) days of uploading said documents.

### III.   MITIGATION PAYMENT, REIMBURSEMENT OF LITIGATION FEES AND COSTS, OVERSIGHT, AND STIPULATED PAYMENTS

15.     **Mitigation Payment.**  In recognition of the good faith efforts by Tri-C to comply with all aspects of the General Permit and the Clean Water Act, and in lieu of payment by Tri-C of any penalties, which have been disputed but may have been assessed in this action if it had been adjudicated adverse to Tri-C, the Settling Parties agree that Tri-C will pay the sum of  thirty-five thousand dollars ($35,000) to the Rose Foundation for Communities and the Environment ("Rose Foundation") for the sole purpose of providing grants to environmentally beneficial projects relating to water quality improvements in Sacramento River and Sacramento-San Joaquin Delta. Payment shall be provided to the Rose Foundation as follows: Rose Foundation, 201 4th Street, Suite 102, Oakland, CA 94607, Attn: Tim Little.  Payment shall be made by Tri-C to the Rose Foundation within one-hundred-twenty (120) calendar days of the Effective Date.  Tri-C shall copy CSPA with any correspondence and a copy of the check sent to the Rose Foundation.  The Rose Foundation shall provide notice to the Settling Parties within thirty (30) days of when the funds are disbursed by the Rose Foundation, setting forth the recipient(s) and purpose(s) of the funds.

16.     **Reimbursement of Fees and Costs.**  Tri-C shall reimburse CSPA in the amount of thirty-six thousand five hundred dollars ($36,500.00) to help defray CSPA's reasonable investigation, expert, and attorneys' fees and costs, and all other reasonable costs incurred as a result of investigating the activities at the Facility related to this Consent Decree, bringing these matters to Tri-C's attention, and negotiating a resolution of this action in the public interest.  The payment shall be made within thirty (30) days of the Effective Date.  The payment shall be made via

wire transfer or check, made payable to: "Lozeau Drury LLP" and delivered by overnight delivery, unless payment via wire transfer, to: Lozeau Drury LLP, c/o Rebecca Davis, 1939 Harrison St, Suite 150, Oakland, CA 94612.

17. **Compliance Monitoring Funds.**  As reimbursement for CSPA's future fees and costs that will be incurred in order for CSPA to monitor Tri-C's compliance with this Consent Decree and to effectively meet and confer and evaluate storm water monitoring results for the Facility, Tri-C agrees to pay CSPA the additional sum of three thousand dollars ($3,000) per Reporting Year.  Payment will be made within 30 days of the Effective Date in the manner prescribed for the payment required by paragraph 22.

## IV.   COMMITMENT OF CSPA

18. **Submission of Consent Decree to DOJ.**  Within three (3) business days of receiving all of the Settling Parties' signatures to this Consent Decree, CSPA shall submit this Consent Decree to the U.S. Department of Justice ("DOJ") and EPA for agency review consistent with 40 C.F.R. §135.5.  The agency review period expires forty-five (45) calendar days after receipt by the DOJ, evidenced by correspondence from DOJ establishing the review period.  If for any reason the DOJ or the District Court should decline to approve this Consent Decree in the form presented, the Parties shall use their best efforts to work together to modify the Consent Decree within thirty (30) days so that it is acceptable to the DOJ or the District Court.  If the Parties are unable to modify this Consent Decree in a mutually acceptable manner that is also acceptable to the District Court, this Consent Decree shall immediately be null and void as well as inadmissible as a settlement communication under Federal Rule of Evidence 408 and California Evidence Code section 1152.

//

## V.   WAIVER, RELEASES AND COVENANTS NOT TO SUE

19.   In consideration of the above, and except as otherwise provided by this Consent Decree, the Parties hereby forever and fully release each other and their respective parents, affiliates, subsidiaries, divisions, insurers, successors, assigns, and current and former employees, attorneys, officers, directors and agents from any and all claims and demands of any kind, nature, or description whatsoever, and from any and all liabilities, damages, injuries, actions or causes of action, either at law or in equity, which the Parties have against each other arising from CSPA's allegations and claims as set forth, or as could have been set forth, in the 60-Day Notice Letter and Complaint for  any and all violations of the Permit or the Clean Water Act at the Facility up to and including the Termination Date of this Consent Decree.

20.   **No Admission.**  The Parties enter into this Consent Decree for the purpose of avoiding prolonged and costly litigation.  Nothing in this Consent Decree shall be construed as, and Tri-C expressly does not intend to imply, any admission as to any fact, finding, issue of law, or violation of law, nor shall compliance with this Consent Decree constitute or be construed as an admission by Tri-C of any fact, finding, conclusion, issue of law, or violation of law.  However, this Paragraph shall not diminish or otherwise affect the obligation, responsibilities, and duties of the Parties under this Consent Decree.

## VI.   BREACH OF CONSENT DECREE AND DISPUTE RESOLUTION PROCEDURES

21.   **Informal Dispute Resolution**.  The Settling Parties will engage in "Informal Dispute Resolution" pursuant to the terms of this paragraph:

a. If a dispute under this Agreement arises, including whether any Settling Party believes that a violation of the Agreement and the Court's dismissal order has occurred, the Settling Parties will meet

and confer (telephonically or in-person) within twenty-one (21) days of receiving written notification of a request for such meeting, unless the parties have already met and conferred on the dispute pursuant to paragraph 17.  During the meet and confer proceeding, the Settling Parties will discuss the dispute and make reasonable efforts to devise a mutually acceptable plan, including implementation dates, to resolve the dispute.  The Settling Parties may, upon mutual written agreement, extend the time to conduct the meet and confer discussions beyond twenty-one (21) days.  If meet and confer discussions fail to resolve the dispute, the Settling Parties shall request a magistrate judge of this court to conduct a single mediation session pursuant to such procedures as the magistrate judge may require.  The mediation is to be held within 45 days of the conclusion of the meet and confer discussions, or as soon thereafter as the schedule of the magistrate judge will permit.

b. If any Settling Party fails to meet and confer or mediate within the timeframes set forth in paragraph (a) directly above, or the meet and confer and mediation do not resolve the dispute, after at least twenty-one (21) days have passed after the meet and confer or mediation occurred or should have occurred, either Settling Party may initiate the "Formal Dispute Resolution" procedures outlined directly below.

22.    **Formal Dispute Resolution.**  In any action or proceeding which is brought by any Settling Party against any other Settling Party pertaining to, arising out of, or related to the requirements of the Court's dismissal order and this Agreement, the Settling Parties will first utilize the "Informal Dispute Resolution" proceedings set

forth in the preceding paragraph and, if not successful, the Settling Parties will utilize the "Formal Dispute Resolution" procedures in this paragraph.  "Formal Dispute Resolution" will be initiated by filing a Motion to Show Cause or other appropriately titled motion ("Motion") in the United States District Court,  Eastern District of California, to determine whether either party is in violation of the Agreement and the Court's dismissal order and, if so, to require the violating party to remedy any violation identified by the District Court within a reasonable time frame.  Litigation costs and fees incurred in the Formal Dispute Resolution process will be awarded in accord with the standard established by Section 505 of the Clean Water Act, 33 U.S.C. § 1365.

## VII.   MISCELLANEOUS PROVISIONS

23.    **Effective Date.**  The Effective Date of this Consent Decree shall be upon the subsequent entry of the Consent Decree by the Court.

24.    **Term of Consent Decree.**   If no Phase 2 Treatment System is required pursuant to paragraph 12(b), this Consent Decree shall terminate on the 30th day following notice to CSPA of the fourth QSE following installation of the Phase 1 Treatment System, indicating that no Phase 2 Treatment System is required ("Termination Date 1").  If a Phase 2 Treatment System is required pursuant to paragraph 12(b), but no Phase 3 Treatment System is required pursuant to paragraph 12(c), this Consent Decree shall terminate on the 30th day following notice to CSPA of the fourth QSE following installation of the Phase 2 Treatment System, indicating that no Phase 3 Treatment System is required ("Termination Date 2").  If a Phase 3 Treatment System is required pursuant to paragraph 12(c), this Consent Decree shall terminate on the 30th day following notice to CSPA of installation of the Phase 3 Treatment System ("Termination Date 3").  This Consent Decree shall continue in effect from the Effective Date until Termination Date 1, Termination Date 2, or

Termination Date 3 (whichever is applicable pursuant to this Consent Decree), or until early termination pursuant to paragraph 25, or through the conclusion of any proceeding to enforce this Consent Decree initiated prior to the applicable termination date, or until the completion of any payment or affirmative duty required by this Consent Decree, whichever is the later occurrence.

25. **Early Termination**.  If Tri-C should cease industrial operations at the Facility and file a Notice of Termination ("NOT") under the Industrial Stormwater Permit prior to the Termination Date(s) of this Consent Decree, Tri-C shall send CSPA a copy of the proposed NOT concurrent with its submittal to the Regional Water Board.  Within ten (10) days of the Regional Water Board's approval of the NOT, Tri-C shall notify CSPA in writing of the approval and remit all outstanding payments, including stipulated payments pursuant to paragraph 12(d), to CSPA.  This Consent Decree shall terminate upon notice to CSPA of the NOT and payment of all outstanding payments.  In the event a new successor or assign continues industrial operations at the site and assumes responsibility for implementation of this Consent Decree pursuant to paragraph 36, Tri-C shall notify CSPA within ten (10) days of the transition.

26. **Execution in Counterparts.**  The Consent Decree may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document.

27. **Facsimile Signatures.**  The Parties' signatures to this Consent Decree transmitted by facsimile or electronic mail transmission shall be deemed binding.

28. **Construction.**  The language in all parts of this Consent Decree, unless otherwise stated, shall be construed according to its plain and ordinary meaning.  The captions and paragraph headings used in this Consent Decree are for reference only

and shall not affect the construction of this Consent Decree.

29.     **Authority to Sign.**  The undersigned are authorized to execute this Consent Decree on behalf of their respective parties and have read, understood and agreed to all of the terms and conditions of this Consent Decree.

30.     **Integrated Consent Decree.**  All Consent Decrees, covenants, representations and warranties, express or implied, oral or written, of the Parties concerning the subject matter of this Consent Decree are contained herein.

31.     **Severability.**  In the event that any of the provisions of this Consent Decree are held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

32.     **Choice of Law.**  This Consent Decree shall be governed by the laws of the United States, and where applicable, the laws of the State of California.

33.     **Full Settlement.**  This Consent Decree constitutes a full and final settlement of this matter.  It is expressly understood and agreed that the Consent Decree has been freely and voluntarily entered into by the Parties with and upon advice of counsel.

34.     **Negotiated Consent Decree.**  The Parties have negotiated this Consent Decree, and agree that it shall not be construed against the party preparing it, but shall be construed as if the Parties jointly prepared this Consent Decree, and any uncertainty and ambiguity shall not be interpreted against any one party.

35.     **Modification of the Consent Decree.**  This Consent Decree, and any provisions herein, may not be changed, waived, or discharged unless by a written instrument signed by the Parties.

36.     **Assignment.**  Subject only to the express restrictions contained in this Consent Decree, all of the rights, duties and obligations contained in this Consent

1  Decree shall inure to the benefit of and be binding upon the Parties, and their

2  successors and assigns.  In the event that Tri-C sells all or a portion of its business to

3  another person or entity, Tri-C shall provide CSPA with the name and contact

4  information for the purchasing party within ten (10) days of the sale.

5      37.    **Mailing of Documents to CSPA/Notices/Correspondence.**  Any

6  notices or documents required or provided for by this Consent Decree or related

7  thereto that are to be provided to CSPA pursuant to this Consent Decree shall be, to

8  the extent feasible, sent via electronic mail transmission to the e-mail addresses listed

9  below or, if electronic mail transmission is not feasible, via certified U.S. Mail with

10  return receipt, or by hand delivery to the following address:

11

12          Rebecca Davis
        Lozeau Drury LLP

13          1939 Harrison St., Suite 150

14          Oakland, CA 94612
        E-mail:  rebecca@lozeaudrury.com

15
    Unless requested otherwise by Tri-C, any notices or documents required or

16  provided for by this Consent Decree or related thereto that are to be provided to Tri-C

17  pursuant to this Consent Decree shall, to the extent feasible, be provided by electronic

18  mail transmission to the e-mail addresses listed below, or, if electronic mail

19  transmission is not feasible, by certified U.S. Mail with return receipt, or by hand

20  delivery to the addresses below:

21

22          W. Lee Smith
        Michel and Associates, P.C.

23          180 E. Ocean Blvd., Suite 200

24          Long Beach, CA 90802

25      Notifications of communications shall be deemed submitted on the date that

26  they are emailed, or postmarked and sent by first-class mail or deposited with an

27

28  CONSENT DECREE           18          Case No. 2:20-cv-00037-TLN-EFB

overnight mail/delivery service.  Any changes of address or addressees shall be communicated in the manner described above for giving notices.

38.     The settling Parties hereto enter into this Consent Decree, Order and Final Judgment and submit it to the Court for its approval and entry as a final judgment.

Date: August 1, 2020               CALIFORNIA SPORTFISHING
                                   PROTECTION ALLIANCE


                                   _____/s/_____
                                   William Jennings
                                   Executive Director

Date: July 30, 2020                TRI C MANUFACTURING, INC.


                                   _____/s/_____
                                   L. Clyde Lamar, Sr.


Approved as to form:

Date: August 3, 2020               LOZEAU DRURY LLP

                                   _____/s/_____
                                   Rebecca L. Davis
                                   Attorneys for California Sportfishing
                                   Alliance

Date: July 30, 2020                MICHEL & ASSOCIATES, P.C.

                                   _____/s/_____
                                   W. Lee Smith
                                   Attorney for Tri-C Manufacturing, Inc.

CONSENT DECREE                          19              Case No. 2:20-cv-00037-TLN-EFB

**IT IS SO ORDERED.**


Date: September 28, 2020

_____
Troy L. Nunley
United States District Judge